UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Kenneth Daywitt, Kenneth Parks, Nicholas Luhmann, Joseph Thomas, Ramone Newell, and Allen Pyron, | Case No. 21-cv-1848 (WMW/DTS) |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| Jodi Harpstead, Nancy Johnston, Kathryn Schesso, and Peter Puffer, | |
| Defendants. | |

---

This matter is before the Court on Defendants' motion to dismiss Plaintiffs' complaint. (Dkt. 16.) Plaintiffs oppose Defendants' motion. For the reasons addressed below, Defendants' motion to dismiss is granted.

## BACKGROUND

Plaintiffs are six individuals civilly detained in the Minnesota Sex Offender Program (MSOP). Defendants are Jodi Harpstead, the commissioner of the Minnesota Department of Human Services; Nancy Johnston, the Executive Director of MSOP; Kathryn Schesso, chairperson of MSOP's Media Review Committee; Peter Puffer, a clinical director at MSOP; and Jim Berg, the Deputy Director of MSOP.

The Minnesota Department of Human Services (DHS) operates MSOP, which provides treatment to individuals civilly committed as being a sexually dangerous person or having a sexual psychopathic personality. Minn. Stat. §§ 246B.02, 253D.02, subdivs.

4, 15–16. Under Minnesota law, MSOP must develop and follow policies and procedures to maintain "a secure and orderly environment that is safe for persons in treatment and staff and supportive of the treatment program." Minn. R. 9515.3080, subp. 1.

This case involves Plaintiffs' challenge to MSOP's Policy 420-5230, titled Media Possession by Clients (Media Policy), which includes the following statement of purpose: "To provide guidelines for client access to media, supporting the therapeutic environment of the program and complying with the statutory restrictions for MSOP clients' access to certain materials." Under the Media Policy, certain types of movies and television programs (*e.g.*, movies rated "G," "PG," or "PG-13" and television programs rated "TV-Y," "TV-Y7," "TV-G," "TV-PG," or "TV-14") are presumptively permitted, whereas some types of movies and television programs (*e.g.*, obscene or pornographic videos and movies rated "NC-17" or "X") are categorically prohibited. MSOP's Media Review Committee (Review Committee) reviews different media to determine whether it contains prohibited materials. An MSOP detainee may submit a request for the Review Committee to review a particular movie or television program that is not presumptively permitted, but only certain categories of movies and television programs are eligible for a review request. As relevant here, the Media Policy does *not* permit an MSOP detainee to request the Review Committee to review DVD or Blu-ray videos that exceed 120 minutes in length—including television series or box sets—that are not on the presumptively "permitted" media list.

Plaintiffs have submitted requests for review of several television series that are not on the presumptively "permitted" media list due to their high maturity rating or lack of any rating. According to Plaintiffs, these requests have included the following seven television series: "*POWER Season 6*," "*Black Lightning Seasons 1-3*," "*Schitts Creek Complete Collection*," "*Empire Season 4-5*," "*Narcos Season 1-2*," "*Hand Maid's Tale seasons 1-2*," and "*American God's Season 2*." MSOP's Review Committee has denied Plaintiffs' requests for review of these and other television series. Based on these denials, Plaintiffs allege that MSOP maintains "a custom and practice of discrimination" against Plaintiffs "based on staff convenience." And Plaintiffs allege that they "were denied the right to obtain media containing healthy adult themes . . . by not being allowed to possess media that is age appropriate and comports with [Plaintiffs'] healthy lifestyles and life enrichment."

Plaintiffs commenced this lawsuit against Defendants, in their official and individual capacities, on August 16, 2021. Count I alleges that MSOP's Media Policy deprives Plaintiffs of their right to possess media that is legally permitted and appropriate, in violation of the First Amendment to the United States Constitution. Count II alleges that MSOP's Media Policy unlawfully discriminates against Plaintiffs "by not allowing them the same afforded media options as other patients who are civilly committed," in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. And Count III alleges that Defendants have unreasonably seized media from Plaintiffs, in violation of the Fourth Amendment to the United States

Constitution.[1]  Defendants move to dismiss the complaint for failure to state a claim on which relief can be granted.

## ANALYSIS

Defendants seek dismissal Plaintiffs' complaint for failure to state a claim on which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A plaintiff need not *prove* his or her case at the pleading stage, nor do the pleadings require detailed factual allegations to survive a motion to dismiss.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *L.L. Nelson Enters., Inc. v. County of St. Louis*, 673 F.3d 799, 805 (8th Cir. 2012) (observing that "specific facts are not necessary" and pleadings "need only give the [opposing party] fair notice of what the claim is and the grounds upon which it rests" (internal quotation marks omitted)).  To survive a motion to dismiss, a complaint must allege sufficient facts to state a facially plausible claim to relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570).  Factual allegations that raise only a speculative right to relief are insufficient.  *Twombly*, 550 U.S. at 555.  A district court accepts as true all of the plaintiff's factual allegations and views them in the light most favorable to the plaintiff.  *Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir. 2008).  But legal conclusions couched as factual allegations are not accepted as true.  *Twombly*, 550 U.S. at 555.  And mere "labels

---

[1]  The complaint also includes a "Count IV."  But in Count IV, Plaintiffs request types of relief—namely, compensatory, injunctive and declaratory relief—and do not assert an independent cause of action.

4

and conclusions" as well as a "formulaic recitation of the elements of a cause of action" fail to state a claim for relief. *Id.*

Although a *pro se* plaintiff's complaint must be construed liberally, the complaint must allege sufficient facts to support the plaintiff's claims. *See Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004). On a motion to dismiss, a district court may consider the complaint, exhibits attached to the complaint, documents that are necessarily embraced by the complaint, and relevant public records without converting the motion into one for summary judgment. *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

### I.      Sovereign Immunity

Defendants argue that sovereign immunity precludes Plaintiffs from seeking damages against Defendants in their official capacities. Sovereign immunity is a threshold issue because it implicates a federal court's subject-matter jurisdiction. *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999).

The Eleventh Amendment to the United States Constitution entitles states to sovereign immunity, which prevents any federal court from exercising jurisdiction over a lawsuit against a state. U.S. Const. amend. XI; *accord Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). Sovereign immunity bars a plaintiff from seeking monetary damages against a state, or a state's officers or agencies, in federal court absent consent or congressional abrogation of immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007);

5

*Doe v. Nebraska*, 345 F.3d 593, 597 (8th Cir. 2003).  Defendants undisputedly are employees of the State of Minnesota, and Minnesota has not consented to be sued in federal court pertaining to Plaintiffs' claims in this case.  Indeed, Plaintiffs do not dispute that Defendants are entitled to sovereign immunity.

Because the Court lacks subject-matter jurisdiction over Plaintiffs' claims seeking monetary damages against Defendants in their official capacities, these aspects of Plaintiffs' claims are dismissed.

### II.     Plaintiffs' First Amendment Claim (Count I)

Count I of Plaintiffs' complaint alleges that MSOP's Media Policy deprives Plaintiffs of their right to possess media that is legally permitted and appropriate, in violation of the First Amendment, pursuant to 42 U.S.C. § 1983.

To state a claim for relief under Section 1983, a plaintiff must allege "(1) that the defendant acted under color of state law, and (2) that the alleged conduct deprived the plaintiff of a constitutionally protected federal right." *Van Zee v. Hanson*, 630 F.3d 1126, 1128 (8th Cir. 2011).  Here, because Defendants do not dispute that their actions at MSOP are taken under color of state law, the only question is whether Defendants' alleged conduct in restricting Plaintiffs' access to certain media deprives Plaintiffs of a constitutionally protected federal right.

"The First Amendment [to the United States Constitution], which applies to the states through the Fourteenth Amendment, prohibits laws 'abridging the freedom of speech.'" *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019) (quoting

U.S. Const. amend. I). "The right of freedom of speech 'includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read' as well as 'freedom of inquiry' and 'freedom of thought.'" *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 938–39 (D. Minn. 2014) (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965)). Civilly committed individuals have liberty interests that are "considerably less than those held by members of free society," but they are nonetheless "entitled to more considerate treatment and conditions of confinement" than prisoners. *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (internal quotation marks omitted); *see also Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004) ("Although an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner."). "Any form of involuntary confinement, whether incarceration or involuntary commitment, may necessitate restrictions on the right to free speech." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1038–39 (8th Cir. 2012).

Courts in this District have held that "the *content* of television programming is protected speech under the First Amendment." *Semler v. Johnston*, No. 20-cv-1062 (WMW/LIB), 2021 WL 942095, at *3 (D. Minn. Mar. 12, 2021) (citing *Ivey v. Johnston*, No. 18-cv-1429 (PAM/DTS), 2019 WL 3334346, at *7 (D. Minn. July 24, 2019)); *accord Jannetta v. Minn. Dep't of Human Servs.*, No. 19-CV-2622 (ECT/TNL), 2020 WL 3405430, at *4 (D. Minn. June 1, 2020). However, civil detainees "have no constitutional right to watch television." *Wattleton v. Hodge*, No. 18-cv-00793

(ECT/BRT), 2019 WL 2432159, at *4 (D. Minn. June 11, 2019) (internal quotation marks omitted), *aff'd* 798 F. App'x 964 (8th Cir. 2020); *accord Banks v. Jesson*, No. 11-1706 (MJD/JJK), 2011 WL 6275960, at *1 (D. Minn. Dec. 15, 2011) (concluding that a civil detainee's "right to watch television would certainly be deemed a *de minimis* restriction 'with which the Constitution is not concerned.' " (quoting *Senty-Haugen*, 462 F.3d at 886)). As such, a policy that restricts access to videos "*based on content* . . . implicates constitutionally protected activity" because "watching *certain types* of television or other visual media is . . . protected activity under the First Amendment." *Jannetta*, 2020 WL 3405430, at *4 (emphasis added) (evaluating MSOP policy that restricted access to videos based on whether the video had received a rating).

Here, Plaintiffs challenge one particular aspect of MSOP's Media Policy—namely, that MSOP will not conduct a detainee-requested review of DVD or Blu-ray videos that exceed 120 minutes in length, including television series or box sets, that are not on the presumptively "permitted" media list. Because the challenged aspect of MSOP's Media Policy restricts detainees' access to videos based on length, not content, Plaintiffs' allegations do not implicate protected activity under the First Amendment.

Even if Plaintiffs' allegations implicated protected activity under the First Amendment, this conclusion would not end the inquiry. In *Turner v. Safley*, the Supreme Court of the United States explained that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). When addressing the constitutionality of

8

limitations placed on the rights of civil detainees rather than prison inmates, courts in this District have employed a modified *Turner* analysis. *See Karsjens*, 6 F. Supp. 3d at 937 (evaluating MSOP patient's First Amendment claims "in light of appropriate therapeutic interests as well as relevant safety and security concerns"); *Ivey v. Mooney*, No. 05-2666, 2008 WL 4527792, at *5 (D. Minn. Sept. 30, 2008) (approving application of *Turner* factors to determine whether MSOP's Media Policy "is reasonably related to legitimate institutional and therapeutic interests").

To determine whether a restriction on an MSOP detainee's liberty is constitutional, four modified *Turner* factors are considered:

> (1) whether the MSOP policy at issue bears a rational relationship to legitimate institutional and therapeutic interests; (2) whether the MSOP client has alternative means of exercising the First Amendment right at issue; (3) whether and to what degree accommodation of the right would impact the institution, resources, staff, and other clients; and (4) whether simple and cost-effective alternatives exist that would meet MSOP's objectives.

*Jannetta*, 2020 WL 3405430, at *5 (internal quotation marks omitted). It is a plaintiff's burden to prove that a restriction is not reasonably related to the legitimate interest it purports to further. *See Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir. 1991) (applying *Turner*). And a civil detainee's claim may be dismissed for failure to state a claim if "the legitimate therapeutic or institutional interest of the defendant is obvious from the face of the complaint and the claimant has not pleaded facts that, if true, would establish a plausible basis for relief under the modified *Turner* approach." *Jannetta*, 2020 WL 3405430, at *5.

As to the first modified *Turner* factor, "[i]t is well-established that the rehabilitation of sex offenders and institutional security of MSOP are legitimate government interests under *Turner*." *Id.* (quoting *Stone v. Jesson*, No. 11-cv-0951 (WMW/HB), 2019 WL 7546630, at *5 (D. Minn. Dec. 3, 2019)). Similarly, courts have recognized that detention facilities, including MSOP, have a legitimate interest in reducing administrative burdens and costs associated with reviewing incoming correspondence and media. *See, e.g.*, *Turner*, 482 U.S. at 93 (recognizing the "sheer burden on staff resources required to conduct item-by-item censorship"); *Jannetta*, 2020 WL 3405430, at *6 (observing that "an item-by-item review of every picture, book, audio recording, and video recording places unrealistic demands upon MSOP resources"); *Stone*, 2019 WL 7546630, at *5 (recognizing that MSOP's institutional concerns include "scarce resources").

Here, the challenged aspect of MSOP's Media Policy provides that MSOP will not conduct a detainee-requested review of DVD or Blu-ray videos that exceed 120 minutes in length—including television series or box sets—that are not on the presumptively "permitted" media list. As multiple courts in this District have recognized, unrestricted access to media would hinder the therapeutic purposes of MSOP detention and potentially endanger MSOP staff. *See, e.g.*, *Jannetta*, 2020 WL 3405430, at *6; *Stone*, 2019 WL 7546630, at *5–6. As such, preventing MSOP detainees from having unrestricted access to certain media is rationally related to MSOP's legitimate institutional and therapeutic interests. In addition, prohibiting MSOP detainees from

10

seeking review of lengthy DVD and Blu-ray videos, including television series and box sets, is rationally related to MSOP's legitimate interest in reducing administrative burdens and costs. For these reasons, the MSOP policy at issue has a rational relationship to MSOP's legitimate institutional and therapeutic interests.

The second modified *Turner* factor pertains to whether Plaintiffs have alternative means of exercising the First Amendment right at issue. "That detainees are prohibited from watching specific videos is not rendered unlawful under the *Turner* (or modified *Turner*) approach simply because the detainees have no other means by which to observe the content in those videos." *Jannetta*, 2020 WL 53405430, at *6 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989)). Under MSOP's Media Policy, detainees have access to a significant number of movies and television series. Indeed, the following broad categories of movies and television programs are presumptively permitted under the Media Policy:

> a) All videos rated "G," "PG" or "PG-13" by the Motion Picture Association of America (MPAA), and television shows aired prior to 1975, or rated "TV-Y," "TV-Y7," "TV-G," "TV-PG," or "TV-14" are permitted.
>
> b) Not Rated videos that are documentaries, educational/instructional (i.e., teaching a skill/trade or a specific educational school subject), or related to physical fitness, music concerts, spirituality or relaxation/mindfulness, and made for television films, unless otherwise prohibited under section of [sic] A.3 h-j above.
>
> c) Videos with the Canadian Motion Picture Rating of "G," "PG," and "14A" are permitted, unless an American rating is also present per section C.6 below.

11

> d) Box sets, seasons and series already on the Permitted Media List (420-5230a) or falling under section B.1.a) or c). Box sets, seasons or series are permitted only if all discs are permitted.

An MSOP detainee also may view a video of a major life event with the approval of a primary therapist, and an MSOP detainee may view otherwise prohibited media for therapeutic purposes as provided by MSOP.

In addition to the foregoing categories, each MSOP detainee may, once per month, request review of certain videos that are *not* presumptively permitted. The videos eligible for such review are "R" rated videos, Canadian Motion Picture Association "18A" rated videos, "TV-MA" rated videos, videos on the "prohibited" list that have not already been appealed, or unrated videos that are no more than 120 minutes in length with no more than 60 minutes of additional content on the DVD or Blu-ray disc. As addressed above, the length-based limitation imposed by this aspect of the Media Policy is content-neutral. And Plaintiffs have not alleged that any category of content is incidentally excluded by the length-based limitations in the Media Policy, which distinguishes this case from *Jannetta*, in which the plaintiffs alleged that a prior version of MSOP's Media Policy incidentally prevented detainees from accessing media aimed at LGBT individuals. *See* 2020 WL 3405430, at *6. For these reasons, Plaintiffs' allegations do not suggest that Plaintiffs lack alternative means of exercising the First Amendment right at issue.

The third modified *Turner* factor pertains to whether and to what degree accommodation of the right would impact the institution, resources, staff, and other

12

clients. When evaluating this factor, a court may consider "increased demands on correctional staff." *See Murphy v. Mo. Dep't of Corrs.*, 372 F.3d 979, 984 (8th Cir. 2004). As addressed above, prohibiting MSOP detainees from seeking review of lengthy DVD or Blu-ray videos, including television series or box sets, is rationally related to MSOP's legitimate interest in reducing administrative burdens and costs. Plaintiffs' complaint identifies seven examples of television series to which Plaintiffs have been denied access due to length. Based on the total runtime of the requested television series compilations identified in the complaint, accommodating seven of Plaintiffs' review requests would require nearly a month of MSOP staff time.[2] Because MSOP's Media Policy permits each detainee to submit one media-review request each month, and MSOP's current detainee population exceeds 700 people, the seven review requests identified in the complaint represent only a small fraction of the number of requests MSOP could receive each month.[3] Without a length-based limitation on the videos that MSOP will review

---

[2]    The complaint references season six of "Power," which has a total runtime of approximately 15 hours; all six seasons of "Schitt's Creek," which have a total runtime of approximately 29 hours; three seasons of "Black Lightning," which have a total runtime of approximately 30 hours; two seasons of "Empire," which have a total runtime of approximately 25 hours; two seasons of "Narcos," which have a total runtime of approximately 17 hours; two seasons of "The Handmaid's Tale," which have a total runtime of approximately 18 hours; and one season of "American Gods," which has a total runtime of approximately 8 hours. Combined, these seven requested compilations would take more than three and a half 40-hour work weeks, excluding any time necessary to watch additional DVD or Blu-ray content and any other administrative time necessary to complete the necessary evaluation.

[3]    *See* Minn. Dep't of Human Servs., *Minnesota Sex Offender Program Statistics*, https://mn.gov/dhs/people-we-serve/adults/services/sex-offender-treatment/statistics.jsp (last visited June 28, 2022) (summarizing MSOP population statistics).

based on a detainee's request, significant administrative resources and costs would be required. For these reasons, accommodating Plaintiffs' asserted right would significantly and detrimentally impact the institution, resources, staff, and other clients at MSOP.

The fourth modified *Turner* factor pertains to whether simple and cost-effective alternatives exist that would meet MSOP's objectives. For the reasons addressed above, review of lengthy media is highly burdensome on MSOP resources. Requiring MSOP to perform a "[c]ase-by-case review of box sets . . . is neither simple nor cost-effective." *Stone*, 2019 WL 7546630, at *7 (observing that reviewing "box sets or seasons of television shows is unduly burdensome because a box set or season usually contains many disks"). MSOP's Media Policy imposes an objective, content-neutral limitation on civil detainees' access to television programs that neither directly nor incidentally excludes categories of content. And Plaintiffs' complaint does not suggest that a simple and cost-effective alternative exists that would meet MSOP's objectives. As such, this modified *Turner* factor weighs against the viability of Plaintiffs' First Amendment claim.

In summary, Plaintiffs' allegations do not implicate protected activity under the First Amendment, nor do Plaintiffs' allegations establish a plausible basis for relief under the modified *Turner* approach. For these reasons, Plaintiffs have failed to state a First Amendment claim. Defendants' motion to dismiss this claim, therefore, is granted.

### III. Plaintiffs' Equal Protection Claim (Count II)

Count II of Plaintiffs' complaint alleges that MSOP's Media Policy unlawfully discriminates against Plaintiffs "by not allowing them the same afforded media options as other patients who are civilly committed," in violation of the Equal Protection Clause.

"The Equal Protection Clause of the Fourteenth Amendment provides that no state shall deny to any person within its jurisdiction the equal protection of the laws, and it applies to the federal government through the Due Process Clause of the Fifth Amendment." *New Doe Child #1 v. United States*, 901 F.3d 1015, 1027 (8th Cir. 2018) (internal quotation marks and citations omitted). "The Equal Protection Clause demands that similarly situated individuals be treated alike." *Id.* A plaintiff must show that the defendant treated him or her differently than similarly situated individuals. *See Am. Fam. Ins. v. City of Minneapolis*, 836 F.3d 918, 921 (8th Cir. 2016). If the plaintiff is not a member of a suspect class and the claim does not involve a fundamental right, then the plaintiff's "federal equal protection claim is subject to rational basis review." *Id.* (internal quotation marks omitted).

Plaintiffs vaguely allege that they are not afforded the same media options "as other patients who are civilly committed." But Plaintiffs do not identify any similarly situated civil detainees who are treated differently. Indeed, MSOP's Media Policy expressly provides that it applies to "MSOP, program-wide," which indicates that the Media Policy applies equally to all MSOP detainees. Plaintiffs have not alleged any facts that suggest otherwise. And if Plaintiffs' allegations are that they are treated differently

than individuals who are civilly detained in programs *other* than MSOP, Plaintiffs have not alleged any facts to demonstrate that such individuals are similarly situated to MSOP detainees.

Even if Plaintiffs could demonstrate that MSOP detainees and other civil detainees are similarly situated, Plaintiffs have not alleged that they are members of a suspect class or that MSOP's Media Policy impairs a fundamental right. Rational-basis review, therefore, applies. *Id.* "Under rational basis review, the classification must only be rationally related to a legitimate government interest." *Id.* For the reasons address in Part II of this Order, the challenged aspect of MSOP's Media Policy is rationally related to MSOP's legitimate institutional and therapeutic interests. For this additional reason, Plaintiffs have not stated an equal-protection claim.

Moreover, the existence of a "disparate impact is not sufficient to show a constitutional violation" because the Equal Protection Clause "is not violated absent invidious or discriminatory purpose." *United States v. Farmer*, 73 F.3d 836, 841 (8th Cir. 1996). Plaintiffs allege that "Defendants have made a determination to not allow Plaintiffs the right to further purchase media based on *staff convenience* and laziness," and that Plaintiffs suffered discrimination as a result of these actions. But Plaintiffs do *not* allege facts suggesting that Defendants acted with an invidious or discriminatory purpose. For this additional reason, Plaintiffs have not stated an equal-protection claim.

As Plaintiffs have failed to state an equal-protection claim, Defendants' motion to dismiss this claim is granted.

### IV.     Plaintiffs' Fourth Amendment Claim (Count III)

Count III of Plaintiffs' complaint alleges that, pursuant to MSOP's Media Policy, Defendants have unreasonably seized media from Plaintiffs, in violation of the Fourth Amendment.

"A seizure of property occurs when there is some meaningful interference with an individual's possessory interest in that property." *Beaulieu*, 690 F.3d at 1034 (internal quotation marks omitted). "To determine the constitutionality of a seizure [a court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 1034–35 (internal quotation marks omitted). In the context of civil detention at MSOP, a detainee's Fourth Amendment interests should be weighed against MSOP's interests in maintaining security and order at the facility and ensuring that no contraband reaches MSOP's patients. *See id.* at 1035. A civil detainee typically cannot sustain a Fourth Amendment claim against MSOP employees based on the seizure of materials reasonably deemed to be contraband. *See, e.g.*, *id.* at 1035 (concluding that MSOP detainees could not assert a Fourth Amendment claim based on confiscation of prohibited television sets); *Banks v. Ludeman*, No. 08-5792 (MJD/JJK), 2010 WL 4822892, at *13 (D. Minn. Oct. 4, 2010) ("No reasonable factfinder could conclude that it is 'unreasonable' to seize . . . sexually explicit photographs from a civilly-committed sex offender who is confined, in company with other sex offenders, in an institution that is supposed to provide rehabilitative treatment.").

Plaintiffs' complaint alleges vaguely that "Defendants consistently violate Plaintiffs['] Fourth Amendment Rights through [Defendants'] seizure, media and other related policies and practices." Plaintiffs do not allege facts pertaining to any specific instance in which a particular item of property has been seized from a particular individual. Construed liberally, Plaintiffs appear to allege generally that Defendants violate Plaintiffs' Fourth Amendment rights any time Defendants confiscate a DVD or Blu-ray disc that is not permitted under MSOP's Media Policy. But even if Plaintiffs' vague allegations were sufficient to survive the plausibility requirement of *Twombly* and *Iqbal*, Plaintiffs cannot sustain a Fourth Amendment claim based on MSOP's confiscation of contraband videos. And for the reasons addressed above in Part II of this Order, the challenged aspect of MSOP's Media Policy is rationally related to MSOP's legitimate institutional and therapeutic interests.

Accordingly, Plaintiffs have failed to state a Fourth Amendment claim. Defendants' motion to dismiss this claim, therefore, is granted.

**ORDER**

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss, (Dkt. 16), is **GRANTED** and Plaintiffs' complaint, (Dkt. 1), is **DISMISSED**.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 30, 2022                                   s/Wilhelmina M. Wright
                                                       Wilhelmina M. Wright
                                                       United States District Judge